UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 07-CV-0316 (JFB)
_____

PATRICIA YANKUS,

Plaintiff,

VERSUS

MICHAEL J. ASTRUE,

Defendant.

_____

MEMORANDUM AND ORDER
September 10, 2008
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Patricia Yankus ("plaintiff" or "Yankus") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the decision of the Commissioner of Social Security, dated October 19, 2005, denying Yankus's request for waiver of an alleged overpayment of disability insurance benefits ("DIB"). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12 of the Federal Rules of Civil Procedure. For the reasons set forth below, the case is remanded to the Administrative Law Judge for further proceedings in accordance with this Memorandum and Order.

I. FACTS

A. DIB Overpayments

The Social Security Administration (the "SSA") accorded Yankus DIB effective February 1990 on the grounds that she had end-stage renal failure and had received a kidney transplant. (Administrative Record ("Tr.") 30, 39.) However, between 1995 and 1997, Yankus went back to work as a nurse practitioner at Stony Brook Hospital.[1] (Tr.

---

[1] The Administrative Record contains conflicting information regarding the date upon which plaintiff stopped working in 1997. Plaintiff wrote a letter in 2001 stating that she stopped work on March 31, 1997, used sick and vacation time until August 25, 1997, and then went on unpaid leave until October 15, 1997. (Tr. 44,

26, 131.) In particular, between April and December 1995, plaintiff completed her Trial Work Period ("TWP") (Tr. 67.) The TWP is a nine-month period during which a person receiving DIB may attempt to work but still receive DIB. 20 C.F.R. § 404.1592. Three months after completing the TWP, the DIB recipient becomes ineligible for benefits if she is able to perform "substantial gainful activity." 20 C.F.R. §§ 1592, 1592a. Thus, plaintiff was no longer eligible for DIB as of March 1996. (Tr. 134-35.) In fact, plaintiff earned $54,000 in 1996 and $41,000 in 1997. (Tr. 26.) Nevertheless, plaintiff erroneously received DIB for portions of time between April 1996 and October 1997. (Tr. 62.)

Subsequently, the SSA found that plaintiff was disabled and entitled to DIB during the month of September 1997 and from November 1997 through October 2003 due to a hemorrhage in her right eye. (Tr. 80, 102.) However, Yankus was – again – erroneously paid DIB for two months during 2004. (Tr. 62, 67a.)

Yankus does not dispute that she was erroneously overpaid DIB for portions of time during which she was working and unentitled to benefits in 1996, 1997, and 2004. (Tr. 62, 67a; Pl.'s Motion at 24 and n.16.) However, in April 2004, Yankus requested that the SSA waive recovery of these overpayments. (Tr. 157-64, 104.) The SSA denied this request on September 10, 2004. (Tr. 134-35.)

B. Hearing Before ALJ

Plaintiff requested a hearing before an ALJ and such hearing was held on July 27, 2005.

---

94.) The Administrative Record also contains information suggesting that Yankus simply stopped working in August 1997. (Tr. 48.)

(Tr. 17-29.) The hearing solely consisted of testimony by Yankus, who appeared *pro se*. (Tr. 17-29.)

As the hearing commenced, the following dialogue took place between Yankus and the ALJ regarding the state of plaintiff's administrative file:

> Q: Okay, now are you seeking, this is an overpayment, by the way, the file, the huge file, did you go through that also yourself?
>
> A: I came one day on my own and attempted to go through it, yes.
>
> Q: Yeah, but it's a mess, it wasn't put back together, there's papers all over the place.
>
> A: Your Honor, that's the way that I found it.
>
> Q: All, right, well, it's, it's, water over the bridge anyway. . . .

(Tr. 19.)

The following testimony ensued:

> A: Well, the problem that I have, Your Honor, and what I've attempted to do numerous times is for someone to sit down with me and explain what I received when I received it. If you can explain to me on such a month I got so much an amount, so much a month, so

2

much a month, then I can provide the proper documentation to you clearly indicating the amount that I did agree was overpayment, and the amount that was not overpayment. Such information, I was explaining to the gentleman who quickly sat with me, he said that you earned an income in 1997 when I was supposed to be out. Well, I have documentation that once I went out on disability I never received further wages, Your Honor. I received back pay that was due me, but I never went back to work once I went out on disability. But I can't figure out –

\*\*\*

Q: You went through the local Social Security office to try to resolve this, is that what you're telling me?

A: Yes, and I have documentation of numerous letters I've sent to them asking for someone to sit with me.

Q: See this file, I, I have Exhibits B38 from the Agency, B39, did you set money aside to repay this?

A: I'm paying it now, Your Honor.

Q: How much are you paying, from your salary you're paying?

A: No, I send $50 check in a month.

Q: And are they accepting that?

A: I haven't, they haven't returned it, I've been doing it for quite a, quite a few months.

\*\*\*

Q: Now why didn't you keep money on the side if you were working, didn't you realize that if you're both working and on disability that you may have a problem? Some people who have a problem with that try to get it straightened out, but in the meantime put all this extra disability money on the side.

A: Part of it I believe I was owed, and part of it I did put aside.

Q: Right.

A: And, in fact, if you noticed the checks they were not cashed for almost six months to eight months later.

A: But you eventually cashed them?

A: I did. In fact, I called them and they said do not mail the checks back and do not destroy them.

Q: Well, but that doesn't mean you should cash them, right?

A: I appreciate that.

Q: Disputing the amount overpaid. So, basically, you're, you're saying that it should be lowered. Now I could try to have my staff and Social Security work up a systematic –

***

Q: Okay. Prior overpayment. Let's see, try to see the way this file was worked up, seems to indicate '96 and '97, which this is, so trying to see when the subsequent overpayment would have accrued. . . . well, I could see if our office and or Social Security can do any better job in working this up. I don't have any reason now to question the amounts. Did you submit anything in writing that would lean toward your claim that, in fact, it should only be in the $14,000 to $15,000 range?

A: Well, I submitted several letters to the office asking for some of this that was needed explained so that I could –

Q: But nobody's done that yet?

A: No.

Q: In the local office?

A: The local officer since has been transferred. But someone did meet with me.

Q: See, we're really not equipped to do that here, I don't believe.

***

A: I went back to work in, in '96, I was working, '97, in August, I went out, August of '97 I went out. So '98 would have been back pay, and '99 would have been back pay. And I don't think I have any income after that.

Q: Yeah, but you earned an awful lot in '96 and '97, right?

A: Yes, and I agree I was working then.

Q: And that's when the overpayment accrued, right?

A: I don't think it accrued in '96 and '97 did it?

Q: I'm looking at the records and it seems to indicate that. And, again, this record is very sloppy and I'm concerned about even the numbering. We'll make this the latest pay work-up, earnings work-up, Exhibit 33B. I'll staple this together. Yeah, I mean, from what I can tell we're only dealing with that one period, '96 and '97 and you earned a lot. Now you're saying it didn't come to the level of $19,000, but I'm not sure how I can reduce that. Did you want to

4

send me anything after the hearing summarizing your position in writing, or attaching anything that shows why it should be reduced?

A: Well, I'd rather meet with somebody, Your Honor, and understand – like this is what I have –

Q: Yeah, but I'm not sure our office is equipped to do that, I've never had that request. We, we do the hearings based upon what's provided to us in the file and what the Claimant wants to say. We're not really equipped, this is a hearing. You can't sit down with somebody, that should be done at a local office. I can appreciate the fact that, you know, if that's not happening or they haven't been cooperative. Yeah, Stony Brook, the same time, attendance records, you know, are not available, right, Stony Brook, so that's one little – go ahead, I'm listening to whatever else you want to say.

\*\*\*

Q: Okay, I'll certainly try to be fair to you, but I think maybe we should pause here and give you a chance to get back with me and then I'll have myself and my staff go through the whole process, okay, and see if there's any basis to reduce the overpayment.

(Tr. 20, 21, 22, 24, 26-27, 28.)[2]

C. ALJ Decision

On October 19, 2005, the ALJ ruled against Yankus as follows:

> The claimant was awarded benefits on December 1990, effective February 1990. With her award letter, she was sent a pamphlet advising her of her trial work period responsibilities. The claimant was allowed to work 9 consecutive months without losing benefits, however, benefits would end 3 months following the completion of the trial work period if she were able to perform substantial gainful activity. The claimant completed her trial work period in December 1995, and her extended period of eligibility started in January 1996. The claimant was aware of the trial work period and extended period of eligibility provisions. She even advised

---

[2] As the Court explains *infra*, appended to Yankus's complaint in this action is Yankus's subsequent letter to the ALJ, dated August 15, 2005, in which she describes the basis for her case and appends relevant documents. (*See* Letter, dated August 15, 2005.) This letter is not part of the Administrative Record in this case. In fact, according to plaintiff's complaint, after she received the unfavorable decision from the ALJ that gave rise to the instant action, she called the ALJ's chambers and was informed that her "letter and documentation were never received nor considered in the decision." (Compl. ¶ 10.)

5

th[e] Social Security Administration that she had set aside money to repay the overpayment.

Thus, the Administrative Law Judge finds that the claimant was with fault in causing and receiving this overpayment. Therefore, the Administrative Law Judge finds that the claimant has failed to furnish information which she knew, or should have known to be material, and has accepted benefit payments which she either knew, or could have been expected to know were incorrectly paid. Thus, the claimant was with fault in receiving the overpayment.

Therefore, recovery of the overpayment of $19,905.40 is not waived.

(Tr. 10 (citation omitted).) Plaintiff unsuccessfully appealed the ALJ's decision. (Tr. 2.)

## II. PROCEDURAL HISTORY

Yankus filed her complaint in this action on January 23, 2007. On May 25, 2007, defendant answered the complaint. On July 23, 2007, the parties – with plaintiff proceeding *pro se* – submitted their cross-motions for judgment on the pleadings. After plaintiff retained counsel, however, she submitted an additional memorandum of law in support of her motion and in opposition to defendant's cross-motion, dated October 23, 2007. On November 14, 2007, defendant responded to plaintiff's motion.

## III. STANDARD OF REVIEW

A district court may only set aside a determination by an ALJ that is based upon legal error or that is unsupported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

IV. DISCUSSION

A. Legal Standard

As the Second Circuit has recognized, overpayments of DIB

> will be excused where the recipient of the overpayment was "without fault" and recovery of the overpayment would "defeat the purpose" of the Social Security Act or "would be against equity and good conscience." An overpaid beneficiary may be found to be at fault, and thus not entitled to a waiver, for "(b) Failure to furnish information which he knew or should have known to be material; or (c) . . . Acceptance of a payment which he either knew or could have been expected to know was incorrect." 20 C.F.R. § 404.507(b)-(c) (1984). Recovering an overpayment will "defeat the purpose" of the Act when the individual "needs substantially all of his current income (including social security monthly benefits) to meet current ordinary and necessary living expenses." 20 C.FR. § 404.508(b).

*Cohen v. Bowen*, 837 F.2d 582, 584 (2d Cir. 1988). Moreover, "fault on the part of SSA does not relieve the individual claimant from any fault on his own part. . . ." *Howard v. Secretary of the Dept. of Health and Human Servs. of the U.S.*, 741 F.2d 4, 6-7 (2d Cir. 1984); *see also Borodkin v. Barnhart*, No. 06 Civ. 2583, 2007 U.S. Dist LEXIS 32645, at *8-*9 (S.D.N.Y. May 2, 2007) ("Fault applies only to the individual. Although SSA may have been at fault in making the overpayment, that does not relieve the overpaid individual from liability for repayment if such individual is without fault.") (citation omitted). Indeed, "[t]he pertinent regulation, 20 C.F.R. § 404.511, places on recipients of benefits the responsibility to exercise 'a high degree of care in determining whether circumstances which may cause deductions from his benefits should be brought to the attention of the Administration.'" *Brown v. Bowen*, 905 F.2d 632, 638 (2d Cir. 1990). Thus, a claimant's "confusion" as to whether she is entitled to benefits does not automatically relieve her of fault for overpayments. *See, e.g., Howard v. Astrue*, No. 07-CV-1558, 2007 U.S. Dist. LEXIS 90333, at *8 (E.D.N.Y. Dec. 7, 2007). A claimant bears the burden of demonstrating that she was not at fault. *See Greenberg v. Comm'r of Social Security*, No. 3:95cv593, 1998 U.S. Dist. LEXIS 19793, at *11 (D. Conn. Mar. 30, 1998).

With respect to the proper procedure for determining fault, and as the Second Circuit has recognized, the Supreme Court has held that "where a claimant's 'fault' in receiving overpayments is in issue, recoupment must be preceded by a hearing, since findings of 'fault' require credibility evaluations which can only be properly considered at an oral hearing." *Dorman v. Harris*, 633 F.2d 1035, 1038 n.2 (2d Cir. 1980) (citation omitted) (citing *Califano v. Yamasaki*, 442 U.S. 682 (1979)). Indeed, in interpreting the Supreme Court's mandate with respect to the credibility issue, the Second Circuit has suggested that, depending on the circumstances of the case, an ALJ must make a particular finding as to the claimaint's credibility, "which [is] a factor critical to any determination of fault." *Valente v. Sullivan*, 897 F.2d 54, 56 (2d Cir. 1990) (citation and

7

quotation marks omitted). As the Second Circuit has emphasized,

> "fault" depends on an evaluation of "all pertinent circumstances" including the recipient's "intelligence . . . and physical and mental" condition" as well as his good faith. 20 C.F.R. § 404.507 (1978). We do not see how these can be evaluated absent personal contact between the recipient and the person who decides his case. Evaluating fault, like judging detrimental reliance, usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale (citation omitted).

*Schwingel v. Harris*, 631 F.2d 192, 196 (2d Cir. 1980) (quoting *Califano*, 442 U.S. at 696-97).

Further, the Second Circuit has outlined the heightened duty an ALJ bears in the case of *pro se* claimants:

> [I]n deciding whether the Secretary's conclusions . . . are supported by substantial evidence, which is the test on review, 42 U.S.C. § 1383(c) (3) (incorporating 42 U.S.C. § 405(g)), we must first satisfy ourselves that the claimant has had "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." *Gold v. Secretary of HEW*, 463 F.2d 38, 43 (2d Cir. 1972). The need for this inquiry arises from the essentially nonadversarial nature of a benefits proceeding: the Secretary is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record. *Schauer v. Schweiker*, 675 F.2d 55, slip op. at pp. 2053, 2057 (2d Cir. 1982); *Gold v. Secretary of HEW*, *supra*, 463 F.2d at 43.

Where, as here, the claimant is unrepresented by counsel, the ALJ is under a heightened duty "'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold v. Secretary of HEW*, *supra*, 463 F.2d at 43). A reviewing court must determine whether the ALJ "adequately protect[ed] the rights of [a] pro se litigant by ensuring that all of the relevant facts [are] sufficiently developed and considered." *Hankerson*, *supra*, 636 F.2d at 895.

*Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755-56 (2d Cir. 1982); *see also Dorman v. Harris*, 633 F.2d 1035, 1040 (2d Cir. 1980) (explaining that, in context of hearing regarding waiver of overpayments, recipient's "appearance at the hearing without counsel create[s] a duty for the ALJ 'to scrupulously and conscientiously probe into, inquire of and explore for all the relevant facts. . . .'"); *Howard v. Astrue*, No. 07-CV-1558, 2007 U.S. Dist. LEXIS 90333, at *12 (E.D.N.Y. Dec. 7, 2007) (same);

*Pennerman v. Apfel*, No. 99-CV-3244, 2001 U.S. Dist. LEXIS 6255, at *18 (E.D.N.Y. Apr. 18, 2001) (holding, in context of overpayment waiver hearing that, "[b]ecause a Social Security benefits hearing is a non-adversarial proceeding, the ALJ has an affirmative duty to develop an evidentiary record that is complete and fair. Although this duty to develop the record applies even where the claimant is represented by counsel, it is a heightened duty where, as here, the claimant is unrepresented by counsel.") (citations and quotation marks omitted).

B. Application

For the reasons set forth below, after carefully reviewing the Administrative Record in this case under the deferential standard applicable to Social Security appeals, the Court concludes that the ALJ failed to fully develop the record in accordance with the Second Circuit's mandate for *pro se* claimants and, thus, the Court cannot determine as a matter of law whether substantial evidence supports the ALJ's finding. Consequently, the Court remands this case to the ALJ to conduct a complete and fair hearing that takes into account all of the evidence plaintiff wishes to provide in support of her request for waiver, including – as set forth *infra* – documents that were originally part of plaintiff's SSA file, but which are inexplicably missing from the Administrative Record.

As a threshold matter, at Yankus's hearing, as described *supra*, the ALJ explicitly noted that her record was a "mess." As a consequence of this "mess," and as the dialogue between Yankus and the ALJ makes abundantly clear, plaintiff did not understand the materials required for her to meet her burden to demonstrate entitlement to a waiver. Nevertheless, the ALJ repeatedly stated that it was not his or his staff's responsibility to clarify the situation and make sense of the "mess" of Yankus's file.[3] As the Court set forth above, the ALJ's stance directly violates the Second Circuit's mandate that ALJs scrupulously develop the record in cases where claimants proceed *pro se*.

Exacerbating this conceded "mess" was the ALJ's apparent failure to consider the submission Yankus made on August 15, 2005 – after her hearing – described *supra*. Although the ALJ rightly afforded plaintiff the opportunity to make this submission, it never became part of the Administrative Record in this case. Indeed, Yankus claimed in her complaint, as stated *supra*, that she was notified in a telephone conversation with the ALJ's chambers subsequent to this hearing that the ALJ did not receive and, therefore, did not consider plaintiff's submission.[4] Consequently, the ALJ failed to mention any aspect of this submission – or, indeed, any other of plaintiff's submissions or arguments in support of waiver – in his decision denying such waiver. Thus, plaintiff was effectively denied the opportunity to correct the inadequacies in her

---

[3] In fact, as described *supra*, the ALJ explicitly stated at the hearing that "we do the hearings based upon what's provided to us in the file and what the Claimant wants to say." However, as the Court set forth above, the ALJ has a duty to develop the record beyond the file – particularly in cases where, as here, the file is a "mess" and the claimant is obviously confused about what she must argue and provide in order to meet her burden.

[4] In her affidavit in support of the instant motion, Yankus stated: "It was agreed at the hearing that I would provide documentation, indicating by my records, the amount of over-payment due. . . . As per the transcripts provided, my information was never considered." (Pl.'s Aff. ¶ 5.)

9

file and point to key documents in order to meet her burden in this case, despite being initially afforded the opportunity to do so.[5]

As further evidence that the record in this case was inadequately developed by the ALJ, plaintiff has submitted several documents in support of her instant motion that, according to plaintiff, were originally part of plaintiff's file in this case but that, for some reason, are not part of the Administrative Record. According to plaintiff, she photocopied certain documents from her file prior to the hearing, but these documents do not appear in the Administrative Record. (*See* Pl.'s Mem. at 14.)[6] Not only was the Administrative Record in this case undeveloped, therefore, it was technically incomplete.

In addition to concluding that the Administrative Record in this case was undeveloped and incomplete, the Court is unable to conclude, based on the text of the ALJ's decision, that he considered the requisite factors in this case – including, most critically, plaintiff's credibility. The Court is aware that the Administrative Record indicates that plaintiff knowingly cashed DIB checks that she knew were overpayments. However, the record also contains ample evidence that plaintiff attempted on numerous occasions to understand her duties and responsibilities with respect to these monies and to comply with the rules of the SSA. (*See* Tr. 66 ("When I received the money, I did call the 1-800 number, to inquire. It is to note, that I never received a notice as to why I received the money until several months later. The conversation with your employee stated that the money was due to me from the appeal

---

[5] Although the Court is unable, based upon the present Administrative Record, to determine the precise significance of each portion of plaintiff's August 15, 2005 submission, including the documents appended thereto, the Court notes that Yankus's letter contains a detailed chronology, with supporting documetation, of her repeated requests for assistance from the SSA in terms of understanding whether – or, at least, to what extent – she owed money to the SSA because of overpayments. For instance, Yankus states: "In the case at hand, I never made any incorrect statement or withheld any information to the Department of Social Security. I have always been honest and informative. In fact, it was the department of Social Security that has not responded to my request for assistance. Even at a face to face conversation, individual members were unable to assist in determining where the Department got their over-payment amount from." (Letter, dated August 15, 2005, at 3.) Consideration of plaintiff's letter, therefore, might have led the ALJ to elicit testimony from the SSA employees in question in order to fully develop the record. (Again, the only testimony elicited at the hearing was from plaintiff herself.) The Second Circuit has held that such testimony from SSA employees could be crucial to determining plaintiff's credibility. *See Dorman*, 633 F.2d at 1040 (remanding in part because "ALJ failed to obtain the testimony of Mr. Shaw and the other SSA employee who spoke to Dorman in January 1976 about his overpayments. Their testimony is crucial, for if Dorman relied on their erroneous recommendations, `he was not at fault in accepting the overpayments. The absence of their testimony – testimony which is necessary to a just determination – weakens the bases for the ALJ's legal and factual conclusions.") (citation and quotation marks omitted).

[6] Again, although the current state of the Administrative Record precludes the Court from accurately determining the significance of these missing documents, the Court notes that they include work activity reports Yankus had apparently provided to the SSA (which may go to plaintiff's credibility to the extent she was accurately reporting her income to the SSA). (*See* Pl.'s Exh. A.)

10

process. At this time it would be a tremendous hardship to stop SSD to pay back any over amount paid. This would require me to start SSI. Therefore, I request a waiver to the collection of the overpayment. Furthermore, I do believe that the accounting of my disability date is incorrect, therefore, the amount requested to pay back is also incorrect."); Tr. 152 ("The income you are questioning came from Social Security. I don't know why I received it (the money), but I have to pay it back. I wrote a letter about the money I have to pay back. I haven't heard anything.").) Moreover, although the ALJ explicitly argued that plaintiff was aware of her "trial work period responsibilities" because of a pamphlet she received with her award letter, plaintiff does not concede that she received this pamphlet and, in any event, it is not part of the Administrative Record. Considering that this pamphlet was evidently important to the ALJ's decision – in that it is the sole piece of documentary evidence cited therein – the pamphlet's absence in the Administrative Record is particularly concerning. Finally, the ALJ's decision does not mention plaintiff's credibility or any of the evidence in the Administrative Record, including plaintiff's testimony at the hearing, that could demonstrate her good faith. In cases such as this, where plaintiff's credibility is squarely at issue, the ALJ's failure to make any findings as to plaintiff's credibility presents an insuperable barrier to the Court's determining as a matter of law that substantial evidence supported the ALJ's decision.

In sum, the ALJ's failure to adequately develop the Administrative Record – as well as the Court's inability to determine, based on the text of the ALJ's decision, that he considered all of the relevant factors (especially plaintiff's credibility) – warrants remand of this case for a complete and fair hearing, at which plaintiff shall have the opportunity to present any evidence she wishes in support of her application for waiver, and at the end of which the ALJ shall make an express determination as to plaintiff's credibility. *See Schwingel*, 631 F.2d at 197 (reversing district court's affirmation of ALJ's decision, ordering remand to ALJ, and observing: "The Secretary argues that it would set a harmful precedent to permit a finding of lack of fault to be based upon a recipient's unsubstantiated claim of failure to remember or to understand the reporting requirements. But the purpose of our remand is precisely to permit a determination of whether there is substance to plaintiff's claim here, particularly in view of her April 1978 affidavit stating that she had not in fact been told the requirements until March of 1976. Moreover we do recognize the possibility that lack of memory or understanding may be a sufficient basis for a finding of lack of fault, taking into account, as the agency's regulations expressly require, the plaintiff's age, comprehension, memory, and physical and mental condition; to hold otherwise would render this requirement idle. The principle we affirm here is simply that the Secretary must adhere to the dictates of fair procedure in making determinations in which credibility is a critical issue."); *Howard*, 2007 U.S. Dist. LEXIS 90333, at *12-*13 ("Here, the ALJ failed to discharge his heightened duty to develop the record because he did not scrupulously and conscientiously inquire into all the relevant facts. Although evidence of Howard's impairment-related work expenses was relevant to the correct amount of the overpayment and was available at the time of the ALJ's hearing, neither the hearing transcript nor the ALJ's decision indicate that the ALJ attempted to develop and consider these expenses. The Commissioner's position that Howard had a duty to request review of his impairment-related work expenses is inconsistent with

the well-established duty placed on an ALJ where a claimant is *pro se*. . . ."); *Lieberman v. Shalala*, 878 F. Supp. 678, 681-82 (S.D.N.Y. 1995) ("Moreover, in her waiver applications and at the hearing, Lieberman claimed that she telephoned the SSA on numerous occasions concerning her benefits. The SSA purportedly advised her that the benefits would terminate in July 1992. Nonetheless, the ALJ neither mentioned § 404.510a in his initial recitation of the pertinent regulations nor otherwise indicated that he considered its potential application in this case. On remand, the Secretary must also consider the application of this regulation. Although the ALJ may have implicitly rejected Lieberman's testimony concerning the telephone calls, and therefore rejected the applicability of § 404.510a, he failed to make an explicit finding regarding her credibility for the record. . . . Where, as here, an assessment of credibility is necessary to determine whether a claimant was without fault, the ALJ must make an explicit finding for the record. Absent such an explicit finding, the Court cannot ascertain the underlying rationale for the determination of fault.") (citations and footnote omitted).[7]

## VI. CONCLUSION

For the foregoing reasons, this case is remanded to the ALJ for further proceedings in accordance with this Memorandum and Order.

---

[7] If on remand the ALJ determines that Yankus was without fault in accepting the overpayments, the ALJ, of course, must proceed to consider whether recoupment is against "equity and good conscience," in accordance with the applicable regulations.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 10, 2008
Central Islip, NY

\* \* \*

Plaintiff is represented by John Antonowicz, Esq., of Fusco, Brandenstein & Rada, P.C., 180 Froelich Farm Blvd., Woodbury, New York, 11797. Defendant is represented by Diane Leonardo Beckmann, Esq., of the United States Attorney's Office, 610 Federal Plaza, Central Islip, New York, 11722.